UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROKIT DRINKS LLC and ROK IMPORTS INC., <br><br> Plaintiffs, <br><br> v. <br><br> LANDRY'S INC. and FERTITTA ENTERTAINMENT INC., <br><br> Defendants. | § § § § § § § § § § § § § CIVIL ACTION NO. <br><br> (JURY TRIAL DEMANDED) |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW, Plaintiffs ROKiT Drinks LLC and ROK Imports Inc. (collectively, "ROKiT Drinks" or "Plaintiffs"), by and through undersigned counsel, and files this Complaint against Defendants Landry's Inc. ("Landry's") and Fertitta Entertainment Inc. ("Fertitta Entertainment") (collectively, "Defendants"), and in support thereof, states as follows:

**PARTIES AND PERSONAL JURISDICTION**

1. Plaintiff ROKiT Drinks LLC is a California corporation with its principal place of business located at 3617 Hayden Ave., Culver City, CA 90232.

2. Plaintiff ROK Imports Inc. is a California corporation with its principal place of business located at 3617 Hayden Ave., Culver City, CA 90232.

3. Defendant Landry's Inc. is a Delaware corporation with its principal place of business located at 1510 West Loop South, Houston, TX 77027. Defendant Landry's may be served with process by serving its registered agent, Steven L. Scheinthal, at 1510 West Loop South,

1

Houston, TX 77027.

4. Defendant Fertitta Entertainment Inc. is a Texas corporation with its principal place of business located at 1510 West Loop South, Houston, TX 77027. Defendant Fertitta Entertainment may be served with process by serving its registered agent, Steven L. Scheinthal, at 1510 West Loop South, Houston, TX 77027.

## SUBJECT MATTER JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and § 1367. This matter exceeds $75,000 in controversy, exclusive of interest and costs, and is between citizens of different states.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because one and/or all of the Defendants resides in this district and a substantial portion of the events and/or omissions giving rise to the claims asserted herein occurred here.

## FACTS

**A. Partnership Background**

7. ROKiT Drinks is a premium drinks business with a unique collection of soft drinks and alcohol brands across spirits, beer and energy drinks.

8. Defendant Landry's is a dining, hospitality, entertainment and gaming company with over 600 locations worldwide. Tilman J. Fertitta ("Fertitta") is the President, Chairman and CEO of Landry's. Defendant Fertitta Entertainment is an entertainment company owned and operated by Tilman J. Fertitta and which includes the following divisions: Landry's Dining, Landry's Hospitality, Landry's Entertainment, Houston Rockets, Golden Nugget, and Post Oak Motor Cars.

9. In or around August 2018, ROKiT Drinks began discussing the possibility of

entering into a partnership with Landry's and Fertitta Entertainment. The partnership would consist of two separate components: (1) a potential sponsorship agreement between ROKiT Marketing[1] and the Houston Rockets ("Rockets") and (2) a potential beverage arrangement between ROKiT Drinks and Landry's.

10. As to the sponsorship agreement, Defendants proposed that ROKiT Marketing would pay an annual multi-million-dollar fee to the Rockets to be a named sponsor on the Rockets' game jerseys and purportedly would receive numerous other benefits outlined in the sponsorship agreement (hereinafter, "Sponsorship Agreement"). For the beverage arrangement, also referred to as the Global Brand Showcase, Defendants proposed that ROKiT Drinks' products, including Bogart Spirits, Bandero Premium Tequila, and ABK Beer, be offered at Landry's over 600 dining, hospitality, entertainment and gaming properties in 36 states and 15 countries (hereinafter, "Beverage Deal").

11. ROKiT Marketing and ROKiT Drinks made it clear that they were only interested in a broad partnership with Defendants and not simply one component, namely the Sponsorship Agreement. Defendants were advised on multiple occasions throughout the parties' negotiations that ROKiT Marketing would only be willing to enter into the Sponsorship Agreement with the Rockets if Landry's entered into the Beverage Deal with ROKiT Drinks. Discussions between the parties make clear that the Sponsorship Agreement provided the impetus for the second partnership in which Defendants promised to leverage its resources to boost the consumption and sales of ROKiT Drinks products.

12. Accordingly, throughout the negotiations on the Sponsorship Agreement, the Defendants repeatedly acknowledged the separate nature of the beverage deal and made repeated

---

[1] ROKiT Marketing, *now known as* Able Events, Inc., is a separate entity from ROKiT Drinks LLC and ROKiT Drinks Imports Inc. ROKiT Marketing filed for Chapter 7 Bankruptcy protection on March 7, 2022.

representations to Plaintiffs that their beverages would be offered at all of Landry's 600+ locations worldwide.

### B.     The Partnership Negotiations

13.    On or about August 7, 2018, Jason Miller of Excel Sports Management, who is believed to have been retained by the Rockets to broker a deal for the Sponsorship Agreement with ROKiT Marketing, relayed to both Tad Brown, CEO of the Rockets, and Patrick Fertitta, Director of Operations at Fertitta Entertainment, ROKiT Marketing's potential interest in a partnership agreement. Mr. Miller indicated that ROKiT was interested in becoming a uniform sponsor for the Rockets with a separate agreement for the sale of ROKiT Drinks' beverages at Landry's locations.

14.    In addition to serving ROKiT Drinks' beverages at all home Rockets games and other Toyota Center events, Patrick Fertitta agreed that Landry's would indeed promote and feature ROKiT Drinks' products at its locations around the world. Jason Miller in turn relayed these details to Clinton Ehrlich of ROKiT Marketing. It was on this basis that ROKiT Marketing agreed to press forward with discussions about the Sponsorship Agreement.

15.    On or about August 13, 2018, Jonathan Kendrick, acting on behalf of both ROKiT Drinks and ROKiT Marketing, met with Tilman Fertitta over lunch at Maestro's in Houston to discuss, among other items, the beverage portion of their proposed business arrangement. Jason Miller of Excel Sports Management was also present. In the meeting, Mr. Kendrick reiterated that the Beverage Deal was a crucial part of the overall partnership, which included the Sponsorship Agreement.

16.    During this lunch Tilman Fertitta selected ROKiT Drinks' Bogarts Vodka in a blind tasting against Tito's Vodka.  This tasting helped cement the deal between the parties.

17.    In addition, the Partnership Proposal and Presentation dated August 13, 2018,

which the parties reviewed at the meeting, included information on both the Sponsorship Agreement and the Beverage Deal (i.e. Global Brand Showcase). The terms of the proposal indicated ROKiT Drinks' beverages, including "Bogart Spirits, Bandero Premium Tequila, and ABK Beer **will** also be showcased at over 600 dining, hospitality, entertainment, and gaming properties in 36 states and 15 countries" belonging to Landry's/Fertitta Entertainment. (emphasis added).

18. Following that meeting, on August 14, 2018, Jason Miller emailed Jonathan Kendrick and Clinton Ehrlich, with copies to Gretchen Sheirr and Tad Brown of the Rockets, regarding the Sponsorship Agreement and the Beverage Deal. Mr. Miller attached a copy of the Partnership Proposal and Presentation and confirmed that he would be introducing Alison Kennedy, CEO of ROKiT Drinks, and James Kramer, Vice President of Beverage Operations of Landry's/Fertitta Entertainment "[u]nder separate cover… so they can [get] the process started on that side of the house [i.e., the beverage deal], and in the meantime, we're going to get going on the sponsorship agreement."

19. The same day, Mr. Miller did indeed introduce Ms. Kennedy and Mr. Kramer via email "**to nail down all the details necessary to lock in distribution for the portfolio at all 600+ Fertitta Entertainment locations**." That afternoon, Ms. Kennedy and Mr. Kramer had a phone call to review next steps in rolling out ROKiT Drinks' beverages at all of Defendants' locations.

20. Following a meeting on or about August 15, 2018, Jonathan Kendrick emailed Patrick Fertitta and James Kramer, stating that he hopes the parties "can work out a deal with the sponsorship **and the beverages**," and further stating that "**if we can combine the two I can do the sponsorship of the Rockets**." Again, Mr. Kendrick acknowledged the two separate proposals, and made clear clear that ROKiT Drinks and ROKiT Marketing were only interested in a

partnership that benefited ROKiT Drinks with the sale of its beverages, and not solely the Sponsorship Agreement.

21. Defendants continued to assure ROKiT Drinks that the Beverage Deal would be part of the partnership. On or around August 20, 2018, Patrick Fertitta and Clinton Ehrlich again met to discuss the partnership between the parties, including the Beverage Deal. Patrick Fertitta followed up the meeting with an email to Clinton Ehrlich on August 21, 2018 stating as follows:

> After speaking with you last night I think it's best that we get together on a call with James Kramer (Director of Beverage Operations) and Steve Scheinthall (General Counsel) **to further discuss how the Rokit spirits division best can integrate within Landry's brands.** It would be great if you could included [sic] Allison and whoever else has expertise on the spirit side for Rokit on the call.

(emphasis added).

22. Pursuant to those meetings, in or around August 2018, ROKiT Drinks, through Ms. Kennedy, entered into an agreement with Landry's and Fertitta Entertainment, through Mr. Kramer, among others, whereby Defendants agreed to facilitate the purchase by and placement of the beverage products of ROKiT Drinks in all of Landry's over 600 owned and operated locations around the world. At this time, Defendants made clear to ROKiT Drinks that the Beverage Deal could only be a verbal agreement, in part, due to the National Basketball Association's (NBA) restrictions at the time that restricted sponsorships by alcohol companies.

23. Over the following months, Mr. Kramer and Ms. Kennedy attended several meetings together, including in-person, to continue working out the details regarding implementation of the Beverage Deal, including details regarding the ordering and distribution of ROKiT Drinks to Landry's various locations. At all times throughout their meetings, Mr. Kramer continued to represent that Landry's would honor their agreement to purchase ROKiT Drinks'

products for all of Landry's locations worldwide. Defendants' continuous representations were also consistent with ROKiT Drinks' position from the outset that a beverage deal to place ROKiT Drinks' products in the Landry's establishments was an essential part of the overall partnership and an incentive for entering into the Sponsorship Agreement.

24. At no time prior to the execution of the Sponsorship Agreement did the Rockets or Landry's ever represent that Landry's would not honor the Beverage Deal with ROKiT Drinks or would otherwise be unable to serve ROKiT Drinks' products in Landry's establishments. In fact, on September 11, 2018, Tad Brown wrote to Jonathan Kendrick by email, with a copy to Clinton Ehrlich, as well as Gretchen Sheirr of the Rockets, noting that he "just saw Alison [Kennedy] earlier and she said everything is moving along well with James [Kramer]."

25. With the Beverage Deal in place and after repeated representations by Defendants that they would honor the Beverage Deal, on or around October 9, 2018, ROKiT Marketing Inc. entered into the Sponsorship Agreement with the Rockets (Rocket Ball, LTD. and Clutch City Sports & Entertainment, L.P.). Under the Sponsorship Agreement, ROKiT Marketing was obligated to pay and did pay the Rockets a Base Contract Price of $9,750.000 for the 2018-2019 season in exchange for advertising and promotional benefits.

26. Although part of the overall relationship contemplated between ROKiT Marketing, ROKiT Drinks and Defendants, the Sponsorship Agreement was completely separate from the Beverage Deal, was entered into among entirely different entities than the Beverage Deal, and, in accordance with the National Basketball Association's (NBA) rules at the time, specifically stated that " [t]his Agreement is for advertising and promotional benefits only and is in no way conditioned on or subject to the sale of Sponsor's alcohol products by Team [i.e., the Rockets]." (Sponsorship Agreement, Ex. D Terms and Conditions § 14(e)).

**C.     Defendants' Incomplete Performance of the Beverage Deal following Execution of the Sponsorship Agreement.**

27.     Following the execution of the Sponsorship Agreement, Landry's and Fertitta Entertainment continued to represent that it would order ROKiT's alcohol products at all of their locations worldwide and continued to take actions consistent with that promise.

28.     Ms. Kennedy flew to Houston to meet with Mr. Kramer to discuss implementation of the Beverage Deal on or around October 22, 2018, as well as, November 12, 2018. In these meetings, the parties discussed the details regarding distribution of ROKiT Drinks to all Landry's locations.

29.     At the end of 2018 and into early 2019, orders of ROKiT Drink beverages from Landry's restaurants began trickling in.

30.     On or around December 7, 2018, pursuant to Mr. Kendrick's request, Ms. Kennedy provided him with the Landry's orders to date and further stated that "Claim jumper cali is supposed to start the beer very shortly." In response, Mr. Kendrick expressed his disappointment with the amount purchased by Landry's, especially following Landry's continued representations to order ROKiT Drinks at all of its "600+ locations." Specifically, Mr. Kendrick stated "[o]k so they have ordered 6k usd!!! Rok g[a]ve them 4.9 m on the ba[sis] we get all our stuff into Landry and in return we get 6 k…" and further indicated "how unhappy" he was.

31.     In the months that followed, both Parties continued to take actions to implement the Beverage Deal, but not at the magnitude promised by Landry's or expected by ROKiT Drinks. For example, on December 18, 2018, Brian Webb, the Corporate Beverage Divisional Vice President for Landry's, requested that Alison Kennedy send samples of ROKiT Drinks, including tequila, gin, whiskey and beer, to Terry Turney, the Senior Vice President and COO of Saltgrass and Claim Jumper, as well as Ken Pierce, the Divisional Vice President for Saltgrass to "sign off."

8

Likewise on or around January 16, 2019, Defendants requested that samples be sent to Chris Morgan, Divisional Director of Wine & Spirits at Morton's Steakhouse, the Oceanaire Seafood Room, Strip House, Morton's Grille, Landry's Inc., and Scott Tarwater, Corporate Director of Wine & Special Events Landry's.[2] Mr. Tarwater responded saying that he had received the samples and would "proudly put these on our owners back bar." And additional orders came through.

32.     However, on or around January 9, 2019, Jonathan Kendrick became aware that the Beverage Deal to get ROKiT Drink products in all of Landry's 600+ locations was still not being implemented in a timely manner. Accordingly, he sent an email to Fertitta Entertainment employees Gretchen Scheirr and Tad Brown stating as follows:

> Tad I am a little disappointed to be honest and found myself in a difficult meeting with jp [John Paul DeJoria] and my board in Ireland[.]
>
> **I know we could not put this in the contract but it was clearly agreed that you wold [sic] help us get our drinks into your outlets and that was the main reason I got the sponsorship through with the Rockets[.]**
>
> NOW that said I love the rockets sponsorship… [b]ut it really does not bode well when we are due to pay you the next installment next week as agreed, **so almost 10m paid and the sales for alcohol stand at… [a] grand total of $11,037.00!!!!!! Or 0.01% of the sponsorship amount.**

33.     Contrary to the Beverage Deal and Landry's representations, only a small percentage of Landry's and/or Fertitta Entertainment locations ever ordered products from ROKiT Drinks. Additionally, even at the Landry's locations that did purchase ROKiT drinks, there were issues with the rollout. For example, at some locations that ordered products from ROKiT drinks, the staff was unable to sell the products because Landry's failed to put a button on the Point-of-

---

[2] Saltgrass, Claim Jumper, Morton's Steakhouse, the Oceanaire Seafood Room, Strip House and Morton's Grille are all restaurant chains owned and operated by Landry's.

Sale (POS) system for the sale of those products.

34. On or around July 9, 2019, almost one year since ROKiT Drinks and Landry's entered into the Beverage Deal, the sales from ROKiT Drinks to Landry's totaled approximately $256,421.25 and consisted of only a small portion of the Landry's establishments in a minority of states. Mr. Kendrick, who had informed ROKiT Drinks' board of directors that Landry's would be buying ROKiT Drinks at all of Landry's locations, responded to that number by stating: "Wow After [a] year that's all….. [that's] tricky for me with the board not as that's not what I sold it on."

35. On or around December 13, 2019, Jonathan Kendrick again expressed his disappointment with Landry's performance under the Beverage Deal in an email to Gretchen Sheirr, stating in relevant part:

> I am really trying to keep this amicable… despite the attached [information regarding Landry's sales] which is so so disappointing **as that was not what I was led to believe the sales would be for our drinks division when we did the Rockets deal**…"

36. Indeed, pursuant to the information and numerous representations provided by Defendants, Plaintiffs reasonably expected a minimum order of ROKiT Drinks' products from each of the Landry's/Fertitta Entertainment establishments, which was expected to cover the cost of the Sponsorship Agreement and produce tens of millions of dollars in revenue to ROKiT Drinks. Instead, as of January 21, 2020, ROKiT Drinks had only made approximately $440,000 in sales to a small portion of the Landry's locations, in violation of the Beverage Deal and the expectations set by Landry's/Fertitta Entertainment.

37. The harm suffered by ROKiT Drinks were exacerbated by the numerous actions the companies took in reliance on Defendants' promise to order ROKiT Drinks at each of its 600+ locations. The actions that ROKiT Drinks took in reliance on Defendants' promise, includes but is not limited to:

- increasing production to prepare for the orders expected from Landry's locations nationwide;

- applying for licensure to sell alcohol in various states where Landry's establishments were located;

- employing mixologists to craft specialty cocktail menus with ROKiT Drinks' products to sell at Landry's establishments; and

- employing specific sales staff and management teams to assist with the sales to Landry's locations in each state.

38. Once Plaintiffs finally realized that Defendants had no intentions of honoring the Beverage Deal, on or around August of 2020, ROKiT Drinks was forced to terminate approximately 26 full-time employees, who were employed for purposes of implementing the Beverage Deal. In addition, Plaintiffs were unable to sell all of the excess product that it had produced in reliance on Defendants' assurances to buy ROKiT Drinks for all of Landry's locations and were forced to destroy a substantial portion of the product produced.

39. Likewise, as a direct result of Defendants' actions, Plaintiffs lost a deal worth tens of millions of dollars with Bogart Brand. The ROKiT Drinks' products that Defendants promised to buy at each of their locations included a line of Bogart Spirits, namely vodka, gin, whiskey and rum.[3] Defendants were aware that these Bogart Spirits were crafted pursuant to an agreement with the Bogart Estate and that Plaintiffs were relying on Defendants' promise to distribute the Bogart Spirits in order to maintain their deal with Bogart Estates. Indeed, Defendants knew that Plaintiffs communicated to the Bogart Estate that Defendants would be ordering Bogart Spirits for each of their 600+ locations and that Plaintiffs were relying on these sales to maintain the brand partnership. Because Defendants failed to order even a fraction of the liquor promised, Plaintiffs lost their deal with Bogart Estates, which resulted in the loss of the tens of millions of dollars that

---

[3] Defendants in conjunction with the Houston Rockets, also built the "Bogart Lounge" in the Toyota Center based around these ROKiT Drinks products.

Plaintiffs had already invested in developing their brand of Bogart Spirits as well as tens of millions of dollars in profits.

40. As a result of Defendants' failure to honor their representations under the Beverage Deal to purchase ROKiT Drinks at all 600+ Landry's locations, and instead ordering only a small portion of what was promised, Plaintiffs incurred substantial damages including but not limited to substantial loss of revenue and out-of-pocket costs.

### **COUNT ONE – BREACH OF CONTRACT** *(Express or Implied)*

41. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

42. Plaintiffs and Defendants entered into a valid and enforceable contract, either express or implied. By this contract, the Parties agreed that Landry's and Fertitta's Entertainment would order ROKiT Drinks products for all of its 600+ locations worldwide and ROKiT Drinks would supply those products. However, Defendants failed to purchase ROKiT Drinks for all of its locations, as promised pursuant to the Beverage Deal.

43. Defendants' breach caused injury to Plaintiffs, which resulted in actual damages and attorney fees.

### **COUNT TWO – PROMISSORY ESTOPPEL**

44. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

45. Defendants promised to order ROKiT Drinks' beverages to offer at all of Defendants' 600+ locations throughout the world. It was foreseeable that ROKiT Drinks would rely on Defendants' promise. Plaintiffs did in fact rely on this promise to their detriment. Defendants failed to keep their promise.

46. Defendants' actions caused injury to Plaintiffs, which resulted in actual, incidental and consequential damages and attorneys' fees.

### COUNT THREE – FRAUD BY MISREPRESENTATION

47. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

48. Defendants, through their agents, made material, false representations described *infra* to the agents of Plaintiffs, namely that Defendants could and would purchase ROKiT Drinks' products at all 600+ Landry's locations.

49. When the material representations were made, the Defendants' agents knew that the material representations were false, or made the material representations recklessly without any knowledge of its truth, and as a positive assertion. Defendants' agents made the material representations with the intent that it should be acted upon by Plaintiffs in furtherance of Defendants' financial gain. Plaintiffs did act in reliance upon the representations, and, as a result, suffered damages.

### COUNT FOUR– FRAUD BY NONDISCLOSURE

50. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

51. Defendants failed to disclose material facts to Plaintiffs, namely, that Defendants were unable to offer ROKiT Drinks products at all of its 600+ locations worldwide in a reasonably timely manner. Defendants had a duty to disclose this fact.

52. Defendants knew that Plaintiffs did not know of Defendants' inability to offer ROKiT Drinks products at all of its establishments in a timely manner and did not have an equal opportunity to discover this fact until after Plaintiffs acted in reliance on its belief that Defendants

would be able to offer Plaintiffs' products in all of their locations. Defendants were deliberately silent when they had a duty to speak. By failing to disclose the facts, Defendants intended to induce Plaintiffs to take some action or refrain from acting. Plaintiffs relied on the Defendant's nondisclosure and were injured as a result of acting without that knowledge.

### COUNT FIVE– NEGLIGENT MISREPRESENTATION

53. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

54. Defendants provided false information in the course of their business, or in a transaction in which they had a pecuniary interest. Generally, Defendants misrepresented their ability to offer ROKiT Drinks' products at all of their 600+ locations in a reasonably timely manner. Defendants did not exercise reasonable care or competence in obtaining or communicating the information. Plaintiffs justifiably relied on the information and suffered damages proximately caused by their reliance on the false information.

### COUNT SIX – BREACH OF THE DECEPTIVE TRADE PRACTICES ACT (DTPA)

55. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

56. Plaintiffs were a "consumer" as defined by the DTPA. Defendants engaged in at least one of the false, misleading, or deceptive acts or practices listed in the DTPA. Generally, Defendants misrepresented their ability to offer ROKiT Drinks' products at all of their 600+ locations in a reasonably timely manner and failed to disclose information and/or made false statements regarding the same. Plaintiffs detrimentally relied on the false, misleading, and/or deceptive acts or practices. Defendants' false, misleading, or deceptive act or practice was a producing cause of Plaintiffs' injury.

## COUNT SEVEN – TORTIOUS INTERFERENCE WITH CONTRACT

57. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

58. Plaintiffs had an existing contract with the Bogart estate regarding the creation and sale of Bogart Spirits by ROKiT Drinks that was subject to interference.

59. Defendants willfully and intentionally interfered with Plaintiffs' contract with Bogart Estates by fraudulently representing that Defendants would purchase Bogart Spirits at each of their locations. Defendants made such representations knowing both that Plaintiffs intended to, and in fact did, communicate these representations to Bogart Estates and that Defendants would not be able to meet these expectations. Defendants' actions constituted a willful and intentional act of interference with Plaintiffs' contract with Bogart Estates.

60. Due to Defendants' interference, namely their actions in inducing Plaintiffs to represent to Bogart Estates that Defendants would be ordering Bogart Spirits at all 600+ Landry's/Fertitta Entertainment locations worldwide and failing to make such orders, as promised, Plaintiffs lost their contract with Bogart Estates. Defendants' actions proximately caused Plaintiffs to lose their contract with Bogart Estates for their line of Bogart Spirits, resulting in tens of millions of dollars in out-of-pocket damages and lost profits.

61. Defendants' actions caused injury to Plaintiffs, which resulted in actual, incidental and consequential damages and attorneys' fees.

## JURY DEMAND

62. Plaintiffs hereby demands a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants for:

(a) Actual damages, including lost profits, out-of-pocket losses, incidental and consequential damages;

(b) Treble damages;

(c) Punitive and/or exemplary damages;

(d) Pre-judgment and post-judgment interest;

(e) An award of attorneys' fees and costs; and

(f) Such other relief as this Court deems just and proper.

Respectfully submitted this 13th day of May, 2022,

By: */s/ Keith B. French*
Keith B. French *(lead counsel)*
KEITH B. FRENCH LAW, PLLC
Texas Bar No. 24115073
kfrench@peoplefirstfirm.com
2010 E. Broadway St., Suite 132
Pearland, Texas 77581
Tel.: (832) 243-6153
Fax: (832) 243-1927

-AND-

Courtney B. Warren
LAW OFFICE OF COURTNEY WARREN PLLC
Federal Bar No. 3394404
Texas Bar No. 24110511
402 Hunt Street
Houston, TX 77003
courtney@cwarrenlaw.com
Phone: (713) 828-9385

**ATTORNEYS FOR PLAINTIFF**